RT REALTY, L.P.; Aetna Casualty and Surety Company n/k/a Travelers Casualty and Surety Company; Lexington Insurance Company; Allstate Insurance Company; Dr. Karl A. Kuchenbacker, P.C.; Wilson, White & Copeland, L.L.P.; and Bailey Vaught Robertson & Company, Appellants,

v.

TEXAS UTILITIES ELECTRIC COMPANY, Appellee.

No. 05–04–00302–CV.

Court of Appeals of Texas, Dallas.

Jan. 13, 2006.

---

E. Stratton Horres, Jr., Rebecca M. Alcantar, Jeffery O. Marshall, Wilson Elser Moskowitz Edelman & Dicker, LLP; William E. Bailey, Law Offices of William E. Bailey; Lawrence T. Bowman, Cozen & O'Connor, P.C.; James Robert Krause, Lawrence J. Friedman, Friedman & Feiger, L.L.P.; Del W. Mecham, Jr.; Claude R. Wilson, Jr., Vial Hamilton, Koch & Knox, Dallas, for Appellants.

Travis E. Vanderpool, Worsham, Forsythe, Sampels & Wooldridge; Melanie Irene Kemp, Dallas, for Appellee.

Before Justices WHITTINGTON, MOSELEY, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

We deny Wilson, White & Copeland, L.L.P.'s motion for rehearing. On our own motion, we withdraw our opinion of November 21, 2005 and vacate our judgment of that date. This is now the opinion of the Court. This is an appeal of the order granting summary judgment dismissing claims against Texas Utilities Electric Company (TU Electric) and granting a motion for sanctions dismissing claims against TU Electric because of RT Realty's spoliation of evidence. For the reasons that follow, we affirm.

### BACKGROUND

Republic Tower II is a fifty-story office tower in downtown Dallas that was built in the 1960s. TU Electric provided electric service for Tower II through the underground network that supplies electrical power to all of the Dallas central business district. During construction, TU Electric representatives and representatives of the builder, architect, and owner (collectively, the customer) worked together to design the electrical vault that would house the equipment needed to supply the 480–volt service requested by the customer. TU Electric specified the weight and size of the transformers to be placed in the vault and the airflow required. The customer then built the vault, which was located in the first level basement (1B) of the parking garage under the Bryan Street sidewalk. It was covered by ventilation grates at the sidewalk level and contained four drains in the bottom. The vault was built primarily of concrete, but one wall was brick.

During initial construction, TU Electric installed current-limiting fuses (CL fuses) in the vault on its side of the point of delivery to protect its equipment from problems on the customer's side of the point of delivery. In the late 1960s or early 1970s, TU Electric discovered that CL fuses did not always prevent arcs [1] in

---

1. An arc is a sustained luminous discharge of electricity across a gap in an electrical circuit.

the 480–volt systems and began to test alternative fire protection systems. As a result of these tests, TU Electric determined that a fenwal system provided better protection than the CL fuses. TU Electric retrofitted all of its 480–volt systems with the fenwal system, including its system for Tower II.

On May 5, 1995, a heavy rainstorm struck the Dallas area, causing extensive flash floods, hail, loss of life, and property damage throughout the area. At that time, RT Realty owned Tower II; and Dr. Karl Kuchenbacker, P.C.; Wilson, White & Copeland, L.L.P.; and Bailey Vaught Robertson & Company (collectively, Appellants) were tenants. Downtown Dallas received over five inches of rainfall per hour that evening. A massive amount of water surged down Bryan Street. Rain water flooded the first floor of Tower II, entering the elevator shaft and causing electrical arcing. Dense smoke filled the entire building. Witnesses testified that drains in the parking garage were unable to remove the amount of water flowing in from the street and accumulating in the garage.

Rain water also fell through the sidewalk ventilation grates into the electrical vault and the vault flooded. The pressure from the accumulating water caused the brick wall of the vault to collapse and spill water into the parking garage. By evening's end, over sixty inches of water collected on level 5B, the lowest below ground level of the parking garage.

Earlier in the evening, Gene Strawn, who worked in the operator room on level 5B, saw water dripping from the access panels in the level 5B ceiling onto one of the pumps responsible for removing water from the drainage systems. He called to have a maintenance man help him cover the pumps. Before help arrived, Strawn observed that another pump was straining to pump the water out of level 5B and that the water level was within one foot of the top of this pump. Strawn also saw water flowing onto the main electrical equipment on level 5B. He did not attempt to determine the source of this water. When the maintenance man arrived, he saw shorting and sparks coming from this equipment. He did not do anything to protect the pumps or the main electrical equipment.

A couple of minutes later, Strawn left. He walked up to level 4B where he saw Dalton Page, Tower II's security officer. Page suggested they move their cars from the underground parking garage because of all the water entering the building, so they drove their cars to the top of the exit ramp. Strawn saw water "coming down real fast" from the entrance ramp as he moved his car. They went to the security console on the main floor to wait out the storm. At one point, Strawn attempted to return to level 5B to check on the equipment, but could not get past the main floor because something, he guessed fumes, burned his eyes and nose. While at the security console, Page heard a loud "explosion" that was later determined to be the brick wall of the vault collapsing from the pressure of the accumulated water. At some point, Tower II lost all power. The building was evacuated and repairs took several months.

RT Realty sued TU Electric[2] for (1) negligence and gross negligence in failing to maintain the vault and in failing to protect RT Realty's electrical equipment, (2) breach of the implied warranties of merchantability and fitness for a particular

See WEBSTER'S THIRD NEW INT'L DICT. 110 (1981).

2. Appellants also sued Dallas Area Rapid Transit and several construction and engineering firms, but they are not involved in this appeal.

purpose, (3) breach of contract, and (4) strict products liability. RT Realty sought recovery in excess of $40 million for property damage. The tenants intervened in the lawsuit and sought recovery in excess of $1.5 million for property damage and loss of business. Aetna and Lexington, who insured RT Realty, and Allstate, who insured Dr. Kuchenbacker, also intervened seeking the recovery of over $17 million they paid to their insureds.[3]

During the discovery phase of litigation, all of the parties' experts agreed the electrical problem on May 5 began with arcs in the customer's main electrical equipment on level 5B caused by water entering the equipment. But the parties disagreed about the source of that water. Appellants initially argued the water came from the vault when the brick wall collapsed. Later, they alleged that as the water level rose in the vault, the water entered the customer's electrical system in the vault because of a faulty seal at the connection between TU Electric's equipment and RT Realty's equipment and then traveled through conduits from level 1B to the main electrical equipment on level 5B. In the opinion of TU Electric's experts, it was not physically possible for this to occur because the equipment that carried the electrical system from the vault to the main electrical equipment on level 5B was ventilated with holes in the conduits and made two ninety degree turns, and the water would have fallen through the ventilation holes before it could have reached the equipment on level 5B.

This ventilated equipment, which had been removed from the building after the flooding, was destroyed while litigation was pending. TU Electric argued it would be impossible to determine whether water traveled through this equipment without physically examining it. Appellants' expert also agreed he would have to examine the equipment to determine that the water actually entered the equipment in the vault and traveled through the system to the main electrical equipment on level 5B.

TU Electric filed a motion for summary judgment on traditional and no evidence grounds, arguing, among other things, that all of Appellants' claimed damages are economic damages for which TU Electric has limited liability under the terms of its tariff, and that it had no duty to protect RT Realty's equipment. TU Electric also filed a motion for sanctions against Appellants, seeking dismissal of their claims because of spoliation of the electrical equipment.

The trial court granted TU Electric's motion for summary judgment "in its entirety," dismissing all claims against TU Electric. The trial court also granted TU Electric's motion for sanctions and struck Appellants' pleadings. Appellants appeal the trial court's rulings.

## SUMMARY JUDGMENT

Appellants argue the trial court erred (1) by granting TU Electric's motion for sanctions and dismissing Appellants' claims and (2) by granting summary judgment in favor of TU Electric. We address the summary judgment issue first. TU Electric filed one motion in which it argued both traditional and no-evidence grounds for summary judgment on all of Appellants' claims.

### Standard of Review

We review a grant of summary judgment de novo. *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 175 (Tex.App.-Dallas

---

3. Because the interests of the insurance companies and RT Realty and its tenants are the same for purposes of this appeal, we refer to them jointly as Appellants. *See Houston Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 669 (Tex.1999).

2000, pet. denied). The standard of review in traditional summary judgment cases is well established. The issue on appeal is whether the movant met its summary judgment burden by establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). The movant bears the burden of proof and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). All evidence and any reasonable inferences must be viewed in the light most favorable to the non-movant. *Nixon*, 690 S.W.2d at 548–49. Evidence favoring the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965). A defendant is entitled to summary judgment if it conclusively negates an essential element of the plaintiff's case or conclusively establishes all necessary elements of an affirmative defense. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995).

In a no evidence summary judgment, a party moves for summary judgment on the ground that there is no evidence of one or more essential elements of a claim on which the adverse party has the burden of proof. Tex.R. Civ. P. 166a(i). The burden then shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact. Tex.R. Civ. P. 166a(i); *Hartis v. Mason & Hanger Corp.*, 7 S.W.3d 700, 702 (Tex.App.-Amarillo 1999, no pet.).

We review a no evidence summary judgment under the same standard as a directed verdict. *King Ranch v. Chapman*, 118 S.W.3d 742, 750–51 (Tex.2003). Accordingly, we examine the record in the light

most favorable to the non-movant and disregard all contrary evidence and inferences. *Id.; Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex.2002). If the non-movant produces more than a scintilla of probative evidence to raise a genuine issue of material fact, then summary judgment is improper. Tex.R. Civ. P. 166a(i); *Wal–Mart*, 92 S.W.3d at 506. A party produces less than a scintilla of evidence when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *King Ranch*, 118 S.W.3d at 751 (quoting *Kindred v. Con/ Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)). A party produces more than a scintilla of evidence if the evidence allows reasonable and fair-minded people to differ in their conclusions. *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)).

## Discussion

In its order granting TU Electric's motion for summary judgment "in its entirety," the trial court cited *Southwestern Bell Telephone Co. v. Metro–Link Telecom, Inc.*, 919 S.W.2d 687, 692–93 (Tex.App.-Houston [14th Dist.] 1996, writ denied), for the proposition that the "filed rate doctrine applies across the spectrum of regulated utilities," and *Mincron SBC Corp. v. Worldcom, Inc.*, 994 S.W.2d 785, 790 (Tex. App.-Houston [1st Dist.] 1999, no pet.), for the proposition that the "filed rate doctrine applies to non-pecuniary terms of service, not just rates." From this we conclude the trial court granted summary judgment in favor of TU Electric because the terms of TU Electric's tariff governed Appellants' claims and that TU Electric was not liable pursuant to its tariff.

### 1. The filed rate doctrine

Prior to 1999,[4] the Public Utility Commission (PUC) had "exclusive jurisdiction to regulate utility rates, operations, and services." *Grant*, 73 S.W.3d at 216; TEX. UTIL.CODE ANN. §§ 32.001(a) & 36.001 (Vernon 1998). The PUC required all utilities to file a document, called a tariff, listing its services and rates for those services. TEX. UTIL.CODE ANN. § 32.101; *Grant*, 73 S.W.3d at 216. This document governed the utility's relationship with its customers. *Grant*, 73 S.W.3d at 216. The tariff amounted to a binding contract between the utility and its customers. *See Houston Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668 (Tex.1999). Aggrieved customers could not enforce alleged rights that contradicted the tariff's provisions. *Grant*, 73 S.W.3d at 217.

Upon approval by the PUC, the tariff was presumed reasonable unless a litigant proved otherwise, and it had the force and effect of law until suspended or set aside. *Grant*, 73 S.W.3d at 216–17. This became known as the "filed rate doctrine." *Id.* Under this doctrine, "a utility's obligations to its customers cannot exceed its duties under a filed tariff." *Id.* at 217. As a result, customers cannot sue a utility in contract or tort over issues governed by the tariff's terms. *Id.*

In *Auchan*, the Texas Supreme Court applied the filed rate doctrine and held that a tariff provision that limits liability for economic damages arising from a utility's negligence is not unreasonable and that the negligence claims were foreclosed by the terms of the tariff. *Auchan*, 995 S.W.2d at 675. But that case did not address whether a tariff may limit liability

for gross negligence or willful misconduct. *Id.* More recently in *Grant*, the supreme court held the tariff, limiting liability for personal injury damages arising from ordinary negligence, was reasonable as a matter of law because it was narrowly drawn and provided a remedy for the utility's gross negligence or willful misconduct. *Grant*, 73 S.W.3d at 220.

### 2. The TU Electric tariff

We review the reasonableness of a tariff as a question of law. *Auchan*, 995 S.W.2d at 671. TU Electric's tariff limited its liability for economic damages, but provided a remedy for damages caused by TU Electric's wanton or willful acts or omissions. The tariff provided:

**4.5.3.1 Company Liability and Responsibility**

Company is responsible for the design, installation, operation and maintenance of electric facilities up to and including the point of delivery except as provided elsewhere in this Tariff for Electric Service. Customer is responsible for the design, installation, operation, and maintenance of electric facilities beyond the point of delivery except as provided elsewhere in this Tariff for Electric Service.

Company may perform voluntary or emergency acts to electric facilities which are the responsibility of the Customer *but shall have no liability for damages or injuries resulting from said acts except to the extent the said damages or injuries are proximately caused by acts or omissions of the Company which are found to be wanton or willful with the intent to cause injury.*

---

4. The Legislature amended the Public Utility Regulatory Act in 1999 "to deregulate the electricity-generation market and to permit certain electricity providers to compete for customers." *Grant*, 73 S.W.3d at 216 (citing SENATE COMM. ON ELEC. UTIL. RESTRUCTURING, BILL

ANALYSIS, Tex. S.B. 7, 76th Leg., R.S. (1999)). The "amendments do not affect a utility's tariff filed under and governed by the pre–1999 regulatory scheme." *Id.* Accordingly, the amendments do not apply to this case.

In any claim or cause of action relating to the provision of electric service asserted by Customer or any other person against Company, *Company shall not be liable for any consequential, special, or non-direct damages,* including but not limited to loss of use of equipment, extra expense due to the use of temporary or replacement equipment, loss of electronic data or program, loss of business revenue, costs of capital or any cost not part of necessary repair to or reasonable replacement of electric equipment whether the claim or cause of action is based upon contract, tort, negligence, products liability, or any other theory of recovery. (emphasis added)

Under Texas law, tariffs such as TU Electric's are reasonable as applied to economic damages resulting from the utility's ordinary negligence. *See Grant,* 73 S.W.3d at 220; *Auchan,* 995 S.W.2d at 675; *First Assembly of God, Inc. v. Tex. Util. Elec. Co.,* 52 S.W.3d 482, 490 (Tex.App.-Dallas 2001, no pet.).

We conclude TU Electric's tariff is reasonable under the circumstances of this case and that it applies to Appellants' claims.

### 3. TU Electric's duty and claimed gross negligence

Appellants argue that TU Electric is liable for Appellants' damages because TU Electric was grossly negligent when it (1) excluded RT Realty from the vault thereby preventing RT Realty from maintaining its electrical equipment, (2) failed to provide adequate protective devices and inform RT Realty of the availability of the fenwal system, (3) failed to inspect the seal in the vault, and (4) failed to install water pumps in the vault.

Appellants argue the tariff's "wanton or willful" language is included within the definition of gross negligence and that the tariff does not deny the customer a remedy for gross negligence.[5] In its motion for summary judgment, TU Electric argued its tariff did not create a duty that TU Electric would protect RT Realty's equipment or maintain the vault.

The threshold inquiry regarding a gross negligence claim is whether a legal duty existed. *See Thapar v. Zezulka,* 994 S.W.2d 635, 637 (Tex.1999). We determine whether TU Electric owed Appellants a legal duty by examining the terms of the tariff. *First Assembly of God, Inc.,* 52 S.W.3d at 491. The existence of a legal duty is a question of law to be decided by the court. *See Mission Petroleum Carriers, Inc. v. Solomon,* 106 S.W.3d 705, 711 (Tex.2003); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990).

a. *Claimed exclusion from the vault*

Appellants contend that TU Electric had exclusive control of the vault and was grossly negligent by failing to allow RT Realty access to the vault to conduct maintenance on its electrical system. Appellants did not make this claim under their gross negligence theory in response to TU Electric's motion for summary judgment—they only made this claim under their repudiation-of-the-tariff theory. Accordingly, we limit our discussion of this issue to Appellants' repudiation theory later in this opinion. *See* TEX.R.APP. P. 33.1(a); *Grant,* 73 S.W.3d at 222.

5. Because the parties do not dispute the definitions of these terms, we will assume, without deciding, that Appellants are correct. *See, e.g., Grant,* 73 S.W.3d at 220 (referring to tariffs providing a remedy for "gross negligence or willful misconduct" or "gross negligence as well as willful or wanton acts"); *Guadalupe–Blanco River Authority v. Pitonyak,* 84 S.W.3d 326, 341 (Tex.App.-Corpus Christi 2002, no pet.) (referring alternately to "gross negligence" and "willful" and "wanton" acts).

b. *Claimed failure to provide adequate protection devices and inform of fenwal system*

Appellants also contend that TU Electric was grossly negligent because it did not provide adequate protective devices to RT Realty or inform it about the fenwal system. We must review TU Electric's tariff to determine the parties' responsibilities. TU Electric's tariff provided:

**4.5.3.2 Customer Liability and Responsibility**

It is particularly understood that the *Customer assumes full responsibility for electric energy furnished to Customer at and past the point of delivery* and will indemnify the Company against and hold the Company harmless from all claims for damages including but not limited to injuries to any persons . . . and damages to property occurring upon the premises of the Customer arising from electric power and energy delivered by Company whether or not caused by the negligence of the Company except when the negligence of Company or its agent or agents was the sole proximate cause of such injuries . . . or damages to property. (emphasis added)

■ This provision, and section 4.5.3.1 which we quoted earlier, supports TU Electric's argument that it owed no duty to RT Realty to protect or maintain equipment past the point of delivery. Nevertheless, Appellants argue TU Electric assumed the duty to protect RT Realty's equipment by installing CL fuses on the customer's side of the point of delivery. But we found no evidence in the record to support Appellants' theory that TU Electric installed CL fuses on RT Realty's side of the point of delivery. And Appellants conceded in their supplemental response to TU Electric's motion for summary judgment that the CL fuses were on TU Electric's side. Additionally, engineers in-

volved in the design and construction of electrical service to Tower II during initial construction testified that CL fuses were installed on TU Electric's side of the point of delivery to protect TU Electric's equipment only. As a result, Appellants offered no evidence that TU Electric assumed a duty to protect RT Realty's equipment and did not raise a fact issue on this point.

c. *Claimed failure to inspect seal*

■ Appellants also argue that TU Electric was grossly negligent because it failed to inspect the seal on RT Realty's electrical equipment in the vault to prevent water from entering it. But this seal is on RT Realty's side of the point of delivery and, pursuant to the tariff, TU Electric had no duty to inspect or maintain any equipment on RT Realty's side of the point of delivery. Accordingly, Appellants failed to raise a fact issue on TU Electric's duty to inspect the seal on RT Realty's electrical equipment.

d. *Claimed failure to maintain vault*

■ Appellants also argue that TU Electric failed to maintain the vault and install pumps to prevent flooding. Again, the tariff does not establish that TU Electric had a duty to maintain the vault. Testimony from engineers involved in the original design stated that the customer was responsible for the vault's drainage design, and Appellants have not directed us to any evidence that raises a fact issue about TU Electric's duty to maintain the vault.

In summary, appellants offered no evidence that TU Electric owed them a duty to protect RT Realty's equipment and prevent the damages that were caused by the May 5 flood. Without a duty, there can be no negligence and no gross negligence. *First Assembly of God, Inc.,* 52 S.W.3d at 491; *see Thapar,* 994 S.W.2d at 637; *Axel-*

*rad v. Jackson,* 142 S.W.3d 418, 422 n. 1 (Tex.App.-Houston [14th Dist.] 2004, pet. filed). The trial court properly granted TU Electric's motion for summary judgment on Appellants' gross negligence claim.

*4. Claimed repudiation of the tariff*

Appellants also claim TU Electric had exclusive control of the vault and repudiated the tariff by failing to allow RT Realty access to the vault to perform maintenance on its equipment, and by installing CL fuses beyond the point of delivery. Appellants claim that TU Electric's repudiation prevented Appellants from performing under the tariff and excused Appellants from performance.

In this case, TU Electric's tariff provided:

**4.5.15 Protection of Company's Facilities on Customer's Premises**

Customer uses reasonable diligence to protect Company facilities on Customer's premises and to permit only personnel authorized by Company or by law to have access to such facilities.

This provision does not deny RT Realty access to the vault, and summary judgment evidence showed that RT Realty could have accessed the vault with an escort from TU Electric. In fact, the only evidence Appellants offered in support of their argument that RT Realty was excluded from the vault is the affidavit of Stephen Anderson, at the time the vice-president of operations and construction for the Tower II property management company. Anderson testified

As far as I am aware, RT Realty did not have access to Texas Utilities Electric Company's ("TXU") vault. Furthermore, the vault grate, located on the Bryan Street sidewalk, remained locked at all times and RT Realty did not have the means to open it. TXU had control

of the only means to gain access to the vault.

But TU Electric's tariff placed the responsibility on the customer to protect TU Electric's facilities on RT Realty's premises, not the reverse. And the tariff did not deny RT Realty access to the vault; instead it required RT Realty as the customer to limit access to TU Electric's facilities on the premises to persons authorized by TU Electric or by law. RT Realty did not present evidence that it attempted to access the vault or that TU Electric denied RT Realty access to the vault. Anderson stated only that, as far as he knew, RT Realty did not have access to the vault. Anderson's affidavit did not raise a fact issue.

Appellants rely on *Henderson v. Central Power & Light,* 977 S.W.2d 439 (Tex.App.-Corpus Christi, pet. denied), to support their argument. In *Henderson,* Central Power & Light's (CPL) tariff required the customer to maintain its connections to CPL's meter box, but CPL placed a seal and warning label on the meter box stating that breaking or tampering with the seal was hazardous and unlawful and "will subject the customer to inspection and resealing charges, to damages and to prosecution." *Id.* at 448. The Hendersons would have had to break the seal in order to perform maintenance on their connection. The *Henderson* court concluded that CPL repudiated the tariff because CPL's actions had prevented the plaintiffs from complying with the maintenance provisions of the tariff. As a result, the court held that the maintenance and limitation of liability provisions of the tariff were unenforceable. *Id.*

The facts in this case are different. Appellants offered no evidence that TU Electric prevented RT Realty from having access to the electrical facilities beyond the

point of delivery, as CPL did in *Henderson.* Even if TU Electric controlled the only means to unlock the vault grate, it does not mean that RT Realty was deprived of access such as to result in repudiation of the tariff. Additionally, as we have noted, we found no evidence to support Appellants' argument that the CL fuses were installed on RT Realty's side of the point of delivery. As a result, the trial court properly granted TU Electric's motion for summary judgment dismissing Appellants' claim that TU Electric repudiated its tariff because Appellants did not raise a fact issue below.

### 5. UCC does not apply to TU Electric's tariff

Appellants asserted claims for breach of the implied warranties of merchantability and fitness for a particular purpose contained in the uniform commercial code. In its motion for summary judgment, TU Electric argued the UCC warranty and conspicuousness requirements do not apply to the provision of electric services and that its tariff contained a disclaimer of these implied warranties.[6] Appellants responded that the disclaimer was not effective because it was not conspicuous as required by the UCC and was only in capital letters and not set off in bold-faced type or otherwise distinguishable. *See* TEX. BUS. & COM.CODE ANN. § 2.316(b) (Vernon 1994).

■ The Texas Supreme Court has already addressed and rejected Appellants' argument. In *Grant,* the supreme court faced a similar issue and concluded that applying article two of the UCC to utility

tariffs would "impair the comprehensive statutory scheme regulating the sale of electricity to Texas consumers" and that "the UCC expressly prohibits such an application." 73 S.W.3d at 218 (citing TEX. BUS. & COM.CODE ANN. § 2.102). Based on *Grant,* we conclude the UCC does not apply to TU Electric's tariff and the trial court properly granted TU Electric's motion for summary judgment on Appellants' breach of warranty claims. *Grant,* 73 S.W.3d at 218–19.

### 6. Claimed breach of contract

■ Appellants claim that TU Electric installed protective devices to protect RT Realty's equipment from dangerous electrical arcing thereby creating an implied-in-fact contract between TU Electric and RT Realty that TU Electric would protect and maintain RT Realty's electrical equipment. Appellants argue they raised a fact issue about whether TU Electric breached this contract by failing to take adequate measures to ensure the safety of the towers. However, as we have already concluded, the tariff is the contract that governs the parties' relationships. It does not place the responsibility on TU Electric for maintenance of electrical facilities on RT Realty's side of the point of delivery. And, as we have also noted, the evidence does not show TU Electric installed protective devices to protect RT Realty's equipment. As a result, Appellants did not raise a fact issue on this point, and the trial court properly granted TU Electric's motion for summary judgment dismissing Appellants' breach of contract claim.

---

6. The tariff provided:
  **4.5.3.3. Disclaimer of Warranties**
  **COMPANY MAKES NO WARRANTIES WHATSOEVER WITH REGARD TO THE PROVISION OF ELECTRIC SERVICE AND DISCLAIMS ANY AND ALL WAR-** **RANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

### 7. Claimed strict liability

Appellants claim that TU Electric continued to provide electricity through the vault even after TU Electric learned the fuse system it installed was inadequate and defective. Appellants claim that the water entering the vault during the rain storm, combined with the defective fuse system that allowed the electricity to continue to flow, created an unreasonably dangerous and hazardous condition. In their response to TU Electric's motion for summary judgment, Appellants argued they produced evidence raising a fact issue that (1) TU Electric actively participated in the design of the vault, (2) TU Electric had control of the final design of the vault, (3) TU Electric maintained exclusive control of the vault and the electrical equipment, and (4) water escaped from the vault through the bus ducts causing the arcing and fire in RT Realty's electrical equipment on level 5B.

As we have already concluded, TU Electric's tariff did not impose a duty on TU Electric to maintain the vault or the electrical equipment on RT Realty's side of the point of delivery. We also concluded that Appellants failed to raise a fact issue that TU Electric denied them access to the vault. And Appellants' strict liability claim is directed at TU Electric's alleged failure to maintain RT Realty's equipment, not the dangerous or defective nature of the electricity itself. Consequently, we conclude Appellants failed to raise a fact issue on their strict liability claim, and the trial court properly granted TU Electric's motion for summary judgment on this claim.

In summary, we conclude Appellants did not raise an issue of fact to preclude summary judgment. For all of the above reasons, we overrule Appellants' second issue and conclude the trial court did not err by granting summary judgment in favor of TU Electric. Because of our disposition of these issues, we do not need to address Appellants' arguments concerning the "act of God" or indemnification provisions of the tariff.

### VIOLATION OF PUBLIC POLICY AND OPEN COURTS PROVISION

Bailey Vaught Robertson & Company argues that allowing TU Electric to "hide" behind its tariff when it is now subject to open competition in the marketplace is a violation of public policy. And Wilson, White & Copeland, L.L.P. argues it is a violation of the open courts provision of the Texas Constitution to deny a tenant, which it argues is not a customer for purposes of the tariff,[7] its day in court. But both parties failed to raise these arguments in the trial court. As a result, the parties did not preserve these issues for our review. TEX.R.APP. P. 33.1(a); *Grant*, 73 S.W.3d at 222.

### DISMISSAL AS SANCTIONS FOR SPOLIATION OF EVIDENCE

Because the resolution of Appellants' second issue is dispositive, we do not address their first issue, in which Appellants argue the trial court abused its discretion by granting TU Electric's motion for sanctions and dismissing their claims.

### CONCLUSION

We conclude the trial court did not err by granting TU Electric's motion for summary judgment and overrule Appellants'

---

**7.** Wilson, White & Copeland, L.L.P.'s argument that it was not a TU Electric customer was not briefed separately in its initial brief on appeal and was raised and argued separately for the first time in its reply brief. This issue was not preserved for our review because it was not raised in the trial court. TEX.R.APP. P. 33.1(a); *Grant*, 73 S.W.3d at 222.

second issue. We do not reach Appellants' first issue. Accordingly, we affirm the trial court's judgment.