**Affirmed and Memorandum Opinion filed October 23, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-16-00867-CV

## KIMBERLY RODRIGUEZ, Appellant

## V.

## CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC., Appellee

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-04368**

## M E M O R A N D U M   O P I N I O N

Appellant Kimberly Rodriguez appeals the trial court's order granting a directed verdict in favor of appellee CenterPoint Energy Houston Electric, LLC. Rodriguez sued CenterPoint, alleging that its negligence and gross negligence caused a fire in a rental house she owned. At the close of Rodriguez's case, the trial court granted a directed verdict, concluding that Rodriguez did not present expert testimony regarding breach of the applicable standard of care or causation, nor did

she present evidence of gross negligence.

In her first two issues, Rodriguez argues expert testimony was unnecessary for a jury to conclude that CenterPoint breached the applicable standard of care and its act or omission caused her damages. In her third issue, Rodriguez argues sufficient evidence of gross negligence exists because CenterPoint knew the dangers of electricity theft yet failed to de-energize her house after telling her it would do so. Having reviewed the record, we conclude that expert testimony regarding breach of the applicable standard of care was necessary and that Rodriguez's failure to present expert testimony regarding breach is fatal to her negligence and gross negligence claims. We therefore affirm the trial court's judgment.

## BACKGROUND

Rodriguez purchased a house located at 1400 Edmunson to remodel and use as a rental property. About a year after she purchased the home, Rodriguez and her then-husband Andy McEathron began remodeling the house. They installed new ceiling fans and checked the electrical outlets and wiring. McEathron also installed a new breaker. Neither Rodriguez nor McEathron are licensed electricians.

After completing the remodel, Rodriguez signed an agreement to lease the house to Kim Bearden and Robert Pugh on April 3, 2010. The lease agreement with Bearden and Pugh required the tenants to establish accounts and pay for all utilities, including electricity. On April 13, Bearden notified Rodriguez that only half of the electricity was working, and Rodriguez began to suspect her tenants were stealing electricity. Rodriguez asked McEathron to look into it.

Late that same evening, McEathron called CenterPoint and told Carl, a CenterPoint customer service representative, that "one leg of the wire coming off the pole is not energized." Carl informed McEathron that no service should exist at

2

the address because it lacked an active account. Carl suggested that, if there was any power on at all, the tenants may have "done it themselves," that it was dangerous, and that it probably explained why the house had only one leg energized. After McEathron told Carl to "take [the tenants' power] down," Carl explained he would issue an emergency trouble order because "I don't want your house burning down." Carl further explained that CenterPoint would disconnect the power, and then once the account was set up and "done the right way," CenterPoint would "go ahead and reenergize them."

At 11:18 p.m. that same evening, CenterPoint sent lineman Mike Diaz to the house. Diaz attempted to disconnect power using a "dongle" device from his service truck. Diaz remained in his truck rather than walking up to the house because of the late hour and concern regarding his safety in the neighborhood. Because the meter was not responding, Diaz could not fully disconnect the power that evening using the dongle. Diaz recommended a follow-up visit by a two-person truck to change the meter. Diaz completed the service call in the early morning hours of April 14, 2010, without disconnecting the electricity.

Rodriguez testified at trial that later that morning she drove by the house.[1] She could see from her car that the electrical equipment—which included the conduit, meter, and breaker box—was pulled away from the wall. She then called CenterPoint and told the customer service representative what she had seen. Rodriguez asked whether an account had been established. When the representative responded that there was no account, Rodriguez directed Center Point not to give the tenants power and said she believed they were stealing electricity. Rodriguez testified that the CenterPoint representative told her they would send a lineman to

---

[1] Rodriguez testified differently on this point at her deposition, where she denied going by the house until the day of the fire.

3

the property and if the lineman saw what Rodriguez had described, then CenterPoint would "red tag it." According to Rodriguez, if a red tag is issued, then the property owner would be required to have an electrician pull a city of Houston permit to get the electricity turned back on. Approximately two hours after Rodriguez's call, CenterPoint received a request from a provider to establish an electricity account for Bearden.

The next day, April 15, CenterPoint sent Kerry Diggins to the house. Diggins, a head lineman for CenterPoint for over thirty years, resolves connection problems related to the delivery of electricity. The remarks section of Diggins's service order report indicates the job was to "investigate tampering." Diggins explained that when he got to the house, it did look as though tampering had occurred and that someone probably was stealing electricity. One leg of the service in the meter was not connected, giving the home only partial service, and it looked as though someone had pulled the meter out of the meter can.[2] The meter can itself was still fastened to the wall, but the meter was ajar, with the seal and band removed. Though it is not clear from the record when they were taken, photographs admitted into evidence show a strap missing from the top of the conduit leading into the meter and the equipment pulled away from, but still attached to, the residence.

Diggins did not feel the meter needed to be replaced, so he reset the meter into the can, checked the voltage, and plugged it in. He then placed the meter lock and seal on the meter can. Diggins made sure everything was secure and checked the voltage in the breaker box to determine whether adequate connectivity existed. Because the breaker box is not owned by CenterPoint, but instead belongs to the

---

[2] A meter has four prongs that, once connected to the electrical conduit, allow electricity to flow into the house. The meter fits inside a metal box or can, known as the meter can, and is secured with a metal lock band.

customer, the only thing the lineman does with the breaker box is check the voltage and connectivity to the meter. After ensuring the breaker box had adequate voltage and connectivity, Diggins called CenterPoint to determine whether power should be established and was told it should be. Diggins then verified with the person at the house (Bearden) that the lights were working, and he left the house energized. Diggins testified that when he left, the system was working and in good shape, and he believed it was in a safe condition.[3] Diggins has worked with other utilities and testified that his practices in this case were consistent with guidelines used by other utilities.

Diggins acknowledged that if he felt the condition was unsafe, he could have left the power off. He testified that the mere allegation of electricity theft does not require CenterPoint to de-energize; instead, it depends upon how the theft occurred and the condition of the equipment. Diggins explained that his work is situational, meaning every situation is different and when a lineman comes upon a job he must assess it from scratch. He uses his training, experience, and judgment to determine whether to energize. In Diggins's experience, the only fires he had seen from electricity theft occurred with the use of jumper cables on the meter. If Diggins had seen jumper cables, he would have removed them and cut off the electricity immediately. Diggins testified that a meter can dangling off the wall of a house is another unsafe condition that would cause him to cut off the electricity. Although the meter can was slightly ajar from the house in this case, it was not dangling or ripped off the wall. After re-setting the meter and checking the voltage in the breaker

---

[3] Diggins explained that although he thought someone was probably stealing electricity, he did not document the theft with photos or an affidavit as he might otherwise do because he felt it would create a hostile situation at the home. During his service visit that day, he had been threatened by a pit bull, and several men sitting on the front porch made him uncomfortable. CenterPoint considered the home to be located in a high-crime area.

box, Diggins determined the situation was safe and left the house energized.

Five days after Diggins completed the service order, the house caught fire. The Arson Division of the Houston Fire Department investigated, concluding that "[t]his accidental fire is the result of an electrical malfunction occurring in the circuit overload protection system of a residence. The overload protection failed to respond when the ceiling fan in the middle bedroom, south side of the residence malfunctioned." The arson investigator explained that an "electrical malfunction occurring in the circuit overload protection system" is a reference to the breaker panel, and that the breaker failed to respond when a ceiling fan malfunctioned. The investigator could not say why the breaker box failed, however, and explained that various reasons for failure could exist. For example, the breaker or ceiling fan could have been installed improperly, or the electrical problem could have occurred between the fan and the breaker panel. Theft of electricity may have created a problem in the electrical system, but the investigator could not state what caused the failure in this case.[4] The arson report does not mention CenterPoint.

CenterPoint electrical engineer Pamela Mendoza provided the only testimony regarding CenterPoint's duties and obligations under its tariff and the standard of good utility practice applicable to utilities. Mendoza explained that good utility practice is situational, governs all employees at CenterPoint, and consists of three parts. The standard of good utility practice (1) considers what other utilities would do in a given situation, (2) considers what the utility representative at issue does with the information available to him or her at the time of the problem, and (3) provides

---

[4] An electrician likewise testified that, in general, damage to a breaker box can have many possible causes, including improper installation, age and related wear and tear, or pulling a breaker box from a wall. The electrician noted that pulling a breaker box from a wall may or may not cause a problem. The electrician spoke in general terms and did not testify regarding the breaker box at issue in this case.

6

that a good decision under the circumstances must be reasonable, though need not be perfect.[5] Mendoza investigated the actions of the CenterPoint employees involved in this case and opined that they complied with the standard of good utility practice. Mendoza specifically agreed with Diggins's decision to keep the electricity connected.

Mendoza acknowledged that electricity theft and meter tampering can cause a dangerous condition, depending on what damage occurs to the equipment, and that it is possible pulling equipment off the wall of a house could cause wiring to become loose, creating a dangerous condition. Mendoza did not say that tampering or pulling had created a dangerous condition in this case. She further testified that CenterPoint can, in its sole discretion, decide not to energize a property if it feels the condition is dangerous. Under the tariff, CenterPoint can also choose to de-energize if the retail customer's electrical installation is of such a character that satisfactory delivery cannot be provided consistent with good utility practice, or if a known dangerous condition exists. But Mendoza testified that simply calling something dangerous, as Carl did in the call with McEathron, does not permit CenterPoint to de-energize. CenterPoint has discretion to de-energize if a dangerous condition is found, not simply based on what is reported. According to Mendoza, it is consistent with good utility practice to send a lineman to investigate a reported dangerous condition, regardless of what is stated to the call representative. In this case, Mendoza testified, CenterPoint did not know of a dangerous condition in the customer's equipment past the meter.

---

[5] Mendoza's definition summarizes generally the definition of good utility practice found at 16 Tex. Admin. Code § 25.5(56). We recently held that "Good Utilities Practice does not impose a different duty of care; rather, it more fully defines what ordinary care is under the facts presented." *Cura-Cruz v. CenterPoint Energy Houston Elec., LLC*, 522 S.W.3d 565, 572 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

Mendoza also testified that once an account is established, CenterPoint is required to provide the customer with power if the situation is "safe and undangerous." Whether good utility practice requires a utility to de-energize or refuse power when the customer puts them on notice of a dangerous condition "depends." A known dangerous condition is based on what you can see at the premises, and Mendoza does not believe there was a known dangerous condition in this case. CenterPoint has a variety of options on how to deal with a known dangerous condition, depending on the situation.

After Mendoza testified, Rodriguez rested her case. CenterPoint moved for directed verdict on grounds that Rodriguez had offered no evidence of the standard of care for a utility, breach of the standard of care, or causation, because she lacked expert testimony on those elements of her negligence claim. CenterPoint also sought a directed verdict on the gross negligence claim, arguing that Rodriguez lacked evidence on both the objective and subjective prongs of the claim, and that any damages would be limited to diminution in value. The trial court ultimately granted CenterPoint's motion. The court determined that Rodriguez "had no expert testimony that CenterPoint Energy breached the 'good utility practice' standard of care," "no expert testimony that an act or omission by CenterPoint Energy caused the fire," and "no evidence to support her gross negligence claim." Based on the directed verdict, the trial court rendered judgment against Rodriguez, ordering that she take nothing on her claims against CenterPoint.

## ANALYSIS

In her first two issues, Rodriguez argues that expert testimony was not required regarding breach of the applicable standard of care or causation because the equipment and techniques at issue were sufficiently clear for the jury to understand. In her third issue, Rodriguez contends that sufficient evidence of gross negligence

exists. We conclude that expert testimony regarding breach of the applicable standard of care was required, and that the lack of expert testimony establishing breach is dispositive of all three of Rodriguez's issues on appeal.

## I. Standard of review

We review a trial court's judgment granting a directed verdict under a legal sufficiency, or no evidence, standard of review. *Tanglewood Homes Ass'n v. Feldman*, 436 S.W.3d 48, 66 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A directed verdict in favor of a defendant is appropriate if the plaintiff fails to present evidence raising a fact issue on an element essential to the plaintiff's claim. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) ("A court may instruct a verdict if no evidence of probative force raises a fact issue on the material questions in the suit."); *Robertson v. Odom*, 296 S.W.3d 151, 155 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In reviewing the directed verdict, we consider the evidence in the light most favorable to the party against whom the verdict was directed, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Robertson*, 296 S.W.3d at 155 (citing *AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 667 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)).

Evidence is legally sufficient to overcome a motion for directed verdict if it would enable reasonable and fair-minded people to reach a verdict for the plaintiff. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence that amounts to mere surmise or suspicion does not rise to the level of a scintilla and is, in legal effect, no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *Oncor Elec. Delivery Co., LLC v. S. Foods Group, LLC*, 444 S.W.3d 699, 703 (Tex. App.—Dallas 2014, no pet.).

**II.    Expert testimony is required to establish CenterPoint breached the applicable standard of care.**

Rodriguez alleges that CenterPoint should not have provided her tenant with electricity after receiving notice of possible electricity theft.   According to Rodriguez, CenterPoint's acts and omissions in failing to de-energize the house constituted negligence and gross negligence, causing damage to her house.

To prove negligence and certain of the prerequisites for gross negligence, Rodriguez had to show: (1) CenterPoint owed a legal duty to her; (2) CenterPoint breached that duty; and (3) Rodriguez suffered damages proximately caused by the breach.  *See Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006) (per curiam) (elements of negligence claim); *RT Realty, L.P. v. Tex. Util. Elec. Co.*, 181 S.W.3d 905, 914-16 (Tex. App.—Dallas 2006, no pet.) (lack of evidence that electric utility owed a negligence duty also barred gross negligence claim); *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 178 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (defendant could not be liable for gross negligence where no duty owed to plaintiff).

Whether expert testimony is required to establish an element of a claim is a question of law that we review de novo.  *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006).  Expert testimony is required when "the alleged negligence is of such a nature as not to be within the experience of the layman."  *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004) (internal quotations omitted).  In determining whether expert testimony is required, Texas courts consider whether the conduct at issue involves the use of specialized equipment and techniques, or knowledge of specialized industry practices and procedures.  *See id.* at 91; *Schwartz v. City of San Antonio ex rel. City Pub. Serv. Bd. of San Antonio*, No. 04-05-00132-CV, 2006 WL 285989, at *4 (Tex. App.—San Antonio Feb. 8, 2006, pet. denied)

(mem. op.); *see also 3D/I+ Perspectiva v. Castner Palms, Ltd.*, 310 S.W.3d 27, 31 (Tex. App.—El Paso 2010, no pet.) (construction-management industry); *Simmons v. Briggs Equip. Trust*, 221 S.W.3d 109, 114-15 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (rail-car industry). Where expert testimony is required, the plaintiff must present evidence on both the standard of care and the violation of that standard. *Simmons*, 221 S.W.3d at 114; *Hager v. Romines*, 913 S.W.2d 733, 734-35 (Tex. App.—Fort Worth 1995, no writ).

As noted above, the only expert that testified regarding the applicable standard of care and breach of that standard was Mendoza. Rodriguez did not provide her own expert. Rodriguez argues on appeal that the circumstances of the case are such that any reasonably prudent person could conclude without expert testimony that the house was at risk of fire. Without citation to authority, she states the equipment and techniques at issue here were sufficiently clear that the jury could conclude CenterPoint was negligent in not de-energizing the electricity to the house. We disagree.

In *Schwartz*, the plaintiff suffered injuries when he came in contact with an energized chain-link fence in his friend's backyard. 2006 WL 285989, at *1. The fence became energized from a downed electrical wire. *Id.* The plaintiff alleged that the energy system operator manually re-energized the system when the operator knew a line was down and should not have done so. *Id.* The trial court granted a no-evidence summary judgment against the plaintiff. *Id.* On appeal, the San Antonio Court of Appeals held expert testimony regarding breach of the applicable standard of care was necessary because "determining whether electrical services were negligently provided, particularly whether the downed wires were improperly re-energized, requires specialized knowledge." *Id.* at *4. The court explained that an energy provider's practices and procedures and the applicable industry standards

11

for energy providers are not within a person's general knowledge. *Schwartz*, 2006 WL 285989, at *4; *see also Hale v. CenterPoint Energy Houston Elec., LLC*, No. 01-16-00963-CV, 2018 WL 3651619, at *2 (Tex. App.—Houston [1st Dist.] Aug. 2, 2018, no pet. h.) (mem. op.) (affirming summary judgment because plaintiff did not present expert testimony that CenterPoint's employees acted negligently).

In this case, Mendoza explained that although a jury may be able to evaluate what the technicians did from a common-sense perspective, they may not be able to evaluate what the technicians did from a technical perspective. Diggins testified that his job as a lineman required about four years of training. Mendoza's technical evaluation involved looking at the electrical connections down to where the meter plugs in. In her opinion, the average person on the street with no utility experience would not know what is reasonable in a particular set of circumstances facing an electric utility.

Proving the standard of care, breach, and causation here required consideration of how a utility functions, some knowledge of electricity, and how the company's equipment operates. We conclude, like the court in *Schwartz*, that evaluating the provision of electricity under the circumstances of this case requires knowledge of a specialized industry with technical equipment and standards that are not within the common knowledge of laymen. 2006 WL 285989, at *4. Rodriguez was therefore required to present expert testimony regarding the appropriate standard of care and whether CenterPoint's conduct met that standard. *See Fulgham*, 154 S.W.3d at 91; *Simmons*, 221 S.W.3d at 115 (plaintiff must present expert testimony of both the standard of care and breach); *Schwartz*, 2006 WL 285989, at *4.

**III.** **There is no expert witness evidence that CenterPoint breached the standard of care.**

CenterPoint argues on appeal that Rodriguez failed to present expert testimony regarding both the standard of care applicable to electric utilities and breach of that standard. We disagree that the record lacks evidence regarding the standard of care. Mendoza testified at length regarding the standard of care applicable to CenterPoint, using both the standard of good utility practice and language from the tariff. The trial did not grant a directed verdict against Rodriguez for lack of evidence on the standard of care. Instead, the trial court concluded that Rodriguez failed to present expert testimony regarding breach of the standard of care. We agree with the trial court.

On appeal, Rodriguez points to no expert testimony proving a breach of the standard of care by CenterPoint, and our review of the record has located none. The only expert testimony regarding compliance with the standard of care came from Mendoza, who opined that CenterPoint had complied. Mendoza explained good utility practice, including the provisions of the tariff allowing a utility to disconnect or de-energize where there is a known dangerous condition. Mendoza also investigated the actions of Diaz, Diggins, and the call representatives and determined that all CenterPoint employees complied with good utility practice. No witness testified that CenterPoint should not have energized the property under the circumstances described. In short, Rodriguez offered no expert evidence controverting CenterPoint's expert testimony that it complied with the applicable standard of care. *See Hager*, 913 S.W.2d at 735 ("The Romineses needed to controvert Hager's testimony with their own expert testimony so that Hager's testimony about his compliance with the standard of care would not be conclusive.").

In her brief, Rodriguez argues evidence of negligence exists because "[e]ven

13

CenterPoint employees told Rodriguez that the power should be disconnected because of the risk of the house catching on fire." Rodriguez provides no citation to the record to support this argument. Having examined the record, we find no evidence that CenterPoint knew there was a dangerous condition when Diggins fixed the meter and fully energized the house.[6]

Yet even if such evidence existed, it would be insufficient to raise a fact issue on breach. In *Hager*, the court addressed a similar argument by the plaintiff that testimony by lay witnesses could establish a breach of the standard of care. *See* 913 S.W.2d at 735. The court stated: "[the plaintiffs'] argument is an attempt to bootstrap lay witnesses' testimony on causation into expert testimony on a violation of the standard of care. No expert witness ever testified that Hager had violated the standard of care." *Id.* Likewise, no expert in this case testified that CenterPoint violated the standard of care by failing to de-energize the house—*e.g.*, that based on what Diggins knew, he should not have plugged in the meter. Absent evidence showing a breach of the standard of care, Rodriguez cannot prevail on her claims of negligence or gross negligence, and the trial court properly granted a directed verdict. *See id.*; *Simmons*, 221 S.W.3d at 115.

Because we have concluded the trial court properly granted a directed verdict based on legally insufficient evidence of a breach of the standard of care, we need not address whether the trial court properly granted a directed verdict based on insufficient evidence of causation or gross negligence. *See* Tex. R. App. P. 47.1. We overrule Rodriguez's three issues on appeal.

---

[6] For example, there is no evidence in our record that having a meter can and breaker box loose from the house wall is dangerous even though a check of the breaker box shows the voltage is good. Nor is there evidence that stealing electricity in the particular manner Diggins believed occurred here creates a dangerous situation that persists after the theft itself has been corrected.

## CONCLUSION

Having overruled Rodriguez's issues on appeal, we affirm the trial court's judgment.


/s/    J. Brett Busby
       Justice


Panel consists of Justices Busby, Brown, and Jewell.